UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

YOU YOU XIA, PETER CLASEN and          08-cv-4415 (JGK)
CHULEEPORN PHUTRAKUL, individually
and on behalf of all others similarly situated,     **DECLARATION OF
YOU YOU XIA**

                    *Plaintiffs*,

          -against-

BYO CO. (USA), LTD. d/b/a EN
and REIKA YO,

                    *Defendants*.
--------------------------------------------------------X

I, YOU YOU XIA, having personal knowledge of the facts

below, declare the truth of the following under penalty of perjury:

      1.     I submit this Declaration in support of Plaintiffs' motion

to certify this case as an FLSA collective action and as a Rule 23 class

action.  I currently reside at 801 E. 45th Street, Unit B, Austin, TX 78751.

      2.     I maintain numerous ties to New York, and am in active

telephonic and email communication with Plaintiffs' counsel in this matter.

Since moving to Texas shortly after the case was filed, I have actively

assisted Mr. Lucas by preparing detailed case-related spreadsheets and notes

for use in this case, and will continue to assist counsel in any way that I can.

I am ready, willing and able to travel to New York whenever it is needed for the case.

3.    I understand that serving as a class representative is an important responsibility, and that I am required to actively participate in the case, review pleadings, be deposed, testify at trial and otherwise assist and monitor the attorneys for the class.  I also understand that I am duty-bound to continue to monitor counsel's handling of this case throughout the pendency of the case.

4.    I am educated (I have a Bachelor's Degree from the University of Texas at Austin and Master's degree from New York University), well-organized, and ready, willing and able to represent the interests of the class of about 55-60 past and present waitstaff employees of EN.

5.    To the best of my knowledge, there are no conflicts of interest between me and any of EN's past or present waitstaff employees.

6.    I, together with Peter Clasen and Chuleeporn "Lee" Phutrakul, have chosen the team of Scott A. Lucas and Steven M. Sack to represent the class because of their experience and success in this area of law, and the fact that Mr. Lucas and Mr. Sack were specifically

recommended for this case by the Legal Referral Service of the New York City Bar Association.

7.    Mr. Lucas and Mr. Sack have worked with us actively to prepare this case over the past six months, and we have had a number of face-to-face meetings, telephone calls, and email exchanges in which Mr. Lucas has thoroughly questioned us about the substance, background and details of this case.  Based on counsel's in-depth analysis and thorough preparation, I am convinced the Legal Referral Service made the right recommendation.

8.    I understand that there is no guarantee of success or recovery, and I hereby affirm my responsibility to pay for litigation costs in the event that I am required to do so, as I am willing to pay my fair share.

9.    Below is a summary of some of the facts that may aid the Court in understanding the factual basis of this action.  In doing so, I will try to avoid unnecessarily repeating facts alleged in the Complaint (which I reviewed and approved before it was filed by counsel).

**Background**

       10.    I was employed as a server at EN Japanese Brasserie, or "EN," from the date it opened in September 2004 until July of 2007. There is generally a high turnover of EN's waitstaff employees.

       11.    Reika Yo directly or indirectly identified herself as EN's owner on numerous occasions, and is recognized by EN's managers as being the owner (or an owner) of EN. She is listed on the Department of State's website (http://www.dos.state.ny.us/) as the "Chairman or Chief Executive Officer" of EN, which is registered under the name "BYO Co. (USA), Ltd." Ms. Yo frequently interacted with EN's General Manager and Floor Managers concerning the manner in which EN is managed and operated, and while her schedule varied, she spent, on average, about two hours a day at EN.

**Class Size**

       12.    With input from my co-plaintiffs, I have been able to identify or partially identify at least 55 waitstaff employees (servers, runners, bussers or bartenders) who have worked at EN at some point since EN opened in September 2004. This list, which I created, is attached hereto

as Ex. "A", and is probably missing the names of a few other waitstaff employees whose names we could not remember.

**EN's Mandatory Tip Pool**

13.    Beginning the day it opened for business, and continuing for the duration of my employment, EN created and administered a mandatory tip pooling scheme.  The servers (including me) were required to turn over all of their tips to EN's management at the end of their shift.

14.    After we turned in our tips, management pooled the tips and redistributed them not only to the waitstaff (servers, bussers, runners and bartenders), but also to non-waitstaff employees whose direct interaction with customers was either *de minimis* or non-existent, including EN's managers and, at one point, EN's kitchen employees.  It should be noted here that the hourly wage component of my paycheck, and that of other waitstaff employees, was less than the federal minimum wage.

15.    I did not register any objection to sharing a percentage of the tips I received with other members of the waitstaff (bussers, runners and bartenders), or with the one floor manager who did often directly assist and/or interact with customers and therefore deserved a share of the tips received by the customers she served (Miki Kanematsu), and I do not know

of any other waiter who registered such an objection.  However, I did not

agree and would not have agreed to EN's practice of redistributing a portion

of the waitstaff's tips to EN's management, kitchen employees, wine

steward or any other non-waitstaff employees or agents, and I am unaware

of any other servers who volunteered to help subsidize EN's payroll by

surrendering their tips to management for partial redistribution to employees

who are not customarily tipped.

16.    While Defendants' "tip pool" distribution practices

varied slightly over time, to the best of my knowledge EN's tip pool always

involved the diversion of tip income to management employees.

17.    The following is a brief summary of the known variations

in EN's mandatory tip pool over time.


**The Mandatory "Tip Pool"**
**Under EN's First General Manager (Bowie Fu)**

18.    Bowie Fu served as EN's General Manager from the time

EN opened in September 2004 until about February of 2005.  During this

period, servers and bartenders were told by EN's management that all tips

went into a single "tip pool".

19.    After receiving our first or second paycheck, it became clear to many servers (including me) that we were not receiving a pro rata share of all of the pooled tips.

20.    Mr. Fu and the two Floor Managers who worked at EN at that time (Yuki [I don't remember his last name] and Orlando Javier) told those of us who asked (including me), in words or substance, that each manager who worked on a given day was receiving a "cut" of that day's tips, and that the kitchen workers as a whole (dishwashers and cooks, etc.) were collectively receiving a "cut" from the "tip pool".

21.    Besides hearing about this distribution scheme from the Floor Managers, I periodically saw EN's Floor Managers recording tip distribution figures on a sheet of paper containing a pre-printed grid.  The distribution figures were recorded on a daily basis at the end of the night, after EN counted all of the waitstaff's tips.

22.    Upon information and belief, under this arrangement one equal portion of each day's tips, *i.e.*, a so-called "full cut," allegedly went to: (A) each manager working that night (*i.e.*, both Floor Managers, and, upon information and belief, the General Manager); (B) each server on duty; (C) each bartender on duty; and (D) the kitchen employees collectively.  (During the period Mr. Fu served as EN's General Manager, EN did not have

separate employees designated as runners or bussers; instead, and each server filled the roles of runner, server and busser.)

23.    I do not presently know who else received money from the "tip pool" at that time.

**The Mandatory "Tip Pool"**
**Under EN's Second General Manager**

24.    Following Bowie Fu's departure as EN's General Manager in about February 2005, Yuki [I don't remember his last name] became EN's acting General Manager and continued in that role for about three months, until about May 2005.  The manner in which EN's mandatory "tip pool" was operated apparently did not change during this three month period.

**The Mandatory "Tip Pool"**
**Under EN's Third General Manager (James Stewart)**

25.    James Stewart became EN's General Manager in or about May 2005 and served in that role until about November 2005.  Shortly after James Stewart became General Manager, EN hired waitstaff employees designated as runners and bussers.

26.    After Mr. Stewart became General Manager, the mandatory "tip pool" was modified somewhat in that servers' tips and bartenders' tips were separated, with each going into a separate "tip pool," and the pool of bartenders' tips was supplemented by a 5% distribution from what was left of the servers' "tip pool" after management took its "share" of the tips.

27.    Upon information and belief, while Mr. Stewart was General Manager, the mandatory "tip pool" was also modified by management in terms of the categories of employees who received distributions, and the amounts or percentages of their respective distributions.  Specifically, upon information and belief, under the "tip pool" in effect during Mr. Stewart's employment as General Manager:  (A) EN's "management" (a term never explained to the waitstaff, but which is likely to have included Floor Managers) generally received a percentage or range of percentages of the servers' and bartenders' respective "tip pools"; (B) each server on duty received a "cut" from the diminished "pool" of servers' tips; (C) each runner on duty received 75% of a "cut" from the diminished "pool" of servers' tips; and (D) each busser on duty received 50% of a diminished "cut" from the "pool" of servers' tips.  (The "kitchen" cut was apparently eliminated shortly after Mr. Stewart became General Manager.)

9

28.     I do not know which other employees or agents received distributions from the "tip pool" during this time.

**The Mandatory "Tip Pool"**
**Under EN's Fourth General Manager (Courtney Kaplan)**

29.     Courtney Kaplan served as EN's acting General Manager under the title of "Interim Manager," from about November 2005 to about May of 2006.  I am unaware of whether or how the tip pool was changed during this period.

**The Mandatory "Tip Pool"**
**Under EN's Fifth General Manager (Yuki Yamashita)**

30.     Yuki Yamashita became EN's General Manager in or about May 2006 and served in that role until about early May 2008.

31.     Shortly after becoming General Manager, Mr. Yamashita informed certain waitstaff employees, including me, in words or substance, that EN's managers would collectively be getting a flat 11% cut "off the top" of the servers' and bartenders' tip pools.

32.     Along with the other waitstaff employees I spoke to, I thought there was little if anything that could be done to stop EN from continuing to give part of the waitstaff's tips to non-waitstaff employees.

Several of us did, however, believe that Defendants would be more likely to limit the extent of their misappropriation of the waitstaff's tips if the waitstaff asked that Defendants' mandatory "tip pool" and distribution system be made transparent in terms of who its recipients were and how much they received.

33.    Accordingly, Peter Clasen and me and several other servers asked Defendants if they would make their mandatory "tip pool" and distribution system transparent in terms of who its recipients were and how much they received.

34.    In response, Yuki Yamashita (the General Manager at the time) told us the tip distribution figures would made available in a "red folder," which we were allowed to look at.

35.    The so-called "red folder" was a red three-ring binder containing sheets of paper, each of which purported to identify a given day's tip distributions by category.

36.    The red folder purported to identify the total amount collected in a given day from all servers on duty and from the bartender on duty, along with the distributions to each server, runner, busser and bartender, and a separate sum from each daily "tip pool" denominated as 11% for "managers" or "management" tips.  However, the ostensible total of

the tips collected by all servers in a given day could not be verified by individual servers because the red folder did not list or otherwise specify the tips turned in by each individual server.

37.     Each server's cash and credit card tips for the night were totaled and set forth in a daily report that each server was required to turn in at the end of the night along with his or her cash tips.  I do not know whether Defendants saved these reports.

38.     However, I can realistically estimate that the amount of tips that showed up on my paycheck each week was, on average over time, less than one-half of the total tips that I turned in.  Some of this discrepancy is understandable because other waitstaff employees such as runners and bussers received a portion of the tip pool, which I do not find objectionable, but much of the discrepancy is due to the fact that a portion of the tip pool proceeds were being diverted to non-waitstaff employees.

39.     Upon information and belief, Yuki Yamashita ceased to be employed as EN's General Manager in May 2008.  I do not know whether or how the mandatory "tip pool" may have changed since his departure.

**The amount of tips diverted by EN**

40.    I do not know the amount of tip income that EN diverted to non-waitstaff employees because I do not presently have access to the daily tip reports that all servers were required to turn in, or the paychecks of each waitstaff employee, or to EN's actual records of the tip distributions it made.

41.    However, I am able to come up with a crude but serviceable estimate for present purposes.  I received about $300 in tip income from customers in a given night (this is a rough estimate, and is based on an averaging of weeknights, when I received less in tips, and weekends, when I received more in tips).

42.    I estimate that of this amount I was given less than half.

43.    <u>Weeknights</u>:  On weeknights, EN had about 3-4 servers, 1 busser, and 1-2 runners.  (EN also had a bartender who worked each night, and who was required to give part of his tips to management and other non-waitstaff employees.)  Since servers received a full "cut" of the tip pool, and bussers and runners received 50% and 75% of a "cut," respectively, the servers working on weeknights (3.5 on average) should have received 3.5 "cuts" from the tip pool, and the 1 busser working on weeknights should have received .5 (or 50%) of a "cut" from the tip pool, and the runners

working on weeknights (1-2, or 1.5 on average) should have received a combined total of 1.125 of a "cut" from the tip pool (*i.e.*, 1.5 x 75%). Accordingly, a rough estimate of the ratio between servers tips on the one hand and bussers and runners on the other on <u>weeknights</u> is <u>68.3% to 31.7%</u> (*i.e.*, 3.5 "cuts" divided by the total of 5.125 "cuts").

44.    <u>Weekend Nights</u>:  On weekend nights, EN had about 6 servers and 1-4 bussers (about 2 on average) and 1-3 runners (about 2 on average).  Since servers received a full "cut" of the tip pool, and bussers and runners received 50% and 75% of a "cut," respectively, the servers working on weekend nights (6 on average) should have received 6 "cuts" from the tip pool, and the bussers working on weekend nights (2 on average) should have received a combined total of 1 "cut" (*i.e.*, 2 x .5 = 1), and the runners working on weeknights (2 on average) should have received a combined total of 1.125 of a "cut" from the tip pool (*i.e.*, 1.5 x 75%).  Accordingly, a rough estimate of the ratio between servers tips on the one hand and bussers and runners on the other on <u>weekend nights</u> is 70.6% to 29.4% (*i.e.*, 6 "cuts" divided by the total of 8.5 "cuts").

45.    Accordingly, since the bartender's tips were separate from the servers' tip pool for most of the time EN has been in operation, we can tentatively conclude that the servers should have been receiving 68.3%

14

of the tip pool on a given weeknight and 70.6% of the tip pool on a given

weekend night, and that bussers and runners should have been collectively

receiving about 31.7% of the tip pool on a given weeknight and 29.4% of the

tip pool on a given weekend night.  For the sake of convenience we can

average the weeknight and weekend night rations as 69% for servers and

31% for bussers and runners collectively.

        46.    By applying these ratios to a rough but conservative

estimate of the average amount of tips collected per night by me (about $300

on average for me, less on weeknights and more on weekends, of which I

generally received no more than [and usually less than] 50%, or $150), and

assuming that other servers collected and later received a comparable

average in tips, we can at least tentatively conclude that servers should have

received, on average, about $207 a night in tips instead of $150 or less,

which suggests that roughly $57 of each server's tips were diverted to non-

waitstaff employees or agents each night, and that a proportionate amount of

the bussers' and runners' tip pool shares were likewise diverted to non-

waitstaff employees since the bussers and runners were also receiving

percentage-based distributions from the same tip pool.

47.    Accordingly, it is safe to assume that the total diversion of tip income to non-tipped employees has run well into the six figures for the waitstaff as a whole over the course of EN's nearly four year history.

48.    This would remain true even if the figures were to be adjusted to give the one Floor Manager who often helped the waitstaff assist customers (Miki Kanematsu) and the wine steward (Taka Okada) each a full "cut" of those tips received from the customers with whom they had some direct interaction.  In fact, even if one disregarded the above ratios, and relied solely on the 11% for managers tips that EN itself listed in the "red folder" as a guide, the total amount of diverted waitstaff tips would still be in the six figures without even factoring in "cut" that was paid over to kitchen employees (dishwashers and cooks) collectively in late 2004 and early 2005.I recently learned that EN presented the New York State Department of Labor (which I complained to in July 2007) with "tip distribution sheets" purporting to show that the total amount of tips diverted to all non-waitstaff employees over nearly four years was only $11,596.82.

49.    I am almost certain that EN did not present NYSDOL with accurate records, and I strongly suspect that EN did not even give the NYSDOL a copy of the daily, computer-generated tip collection reports that each server had to turn in at the end of their shift along with their cash tips.

Accordingly, I have not accepted the NYSDOL's offer to dispose of my claim against EN in exchange for a check calculated based on EN's gross under-reporting of its tip diversions.

50.    I am genuinely interested in helping EN's past and present waitstaff employees obtain the back tips and wages that are rightly theirs, and I ask that this Court permit this action to be maintained as a class action so that this goal can be achieved.

WHEREFORE, I respectfully ask that this Court grant Plaintiffs' motion for class certification.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 27, 2008.

Austin, Texas

_____
YOU YOU XIA

17

**EXHIBIT A**

**<u>En Past and Present Waitstaff Employees</u>**

<u>Servers:</u>

Soonji Chang
Makiko
Ikuko
Yoshikazu
Mariah
Emily Richards
Yoshiko
Yoshihiro
Alice Hsu
Katie Cooper
Maho
Edwin
Yvonne
Hirotake
Ayumi
Mo
Takehiro
Lauren
Jamie Scott
Amelia Midori
Jesse Belardo
Peter P.
Azuki
Danny
Hirokazu
You You Xia
Peter Clasen
Lee Phutrakul
Miki Kanematsu (prior to being floor manager)
Courtney Kaplan (prior to being floor manager)
Taka Okada (prior to being floor manager)
Yuki (prior to being floor manager)

<u>Runner:</u>

James Smith
Kenny
Cherry
Jonathan
Yuka
Short old Japanese girl
Gavin

Bartender:

Mari
Stan Mendoza
Jesse Belardo
Nalu
Jonathan
Ji Young

Bussers :

Evilio
Oscar
Ali
Alejandro
Eddie
Alfredo
Indian guy
New quiet guy (Jessie calls him Javier Potter)
2 brothers